298 So.2d 647

**Charles Eugene CREEL**

v.

**STATE.**

**7 Div. 295.**

Court of Criminal Appeals of Alabama.

July 16, 1974.

Rehearing Denied July 30, 1974.

Cates P. J., and DeCarlo, J., did not participate.

---◆---

HARRIS, Judge.

This is a coram nobis proceeding seeking to overturn a second degree murder conviction in June of 1971. Petitioner was charged with killing his wife by shooting her with a shotgun, and his punishment was fixed by the jury at twenty (20) years in the penitentiary. At his original trial, he was represented by distinguished counsel of his own choice. He did not testify in that trial. There was no appeal from the original judgment of conviction.

A copy of the transcript of the evidence on the trial in chief and the testimony taken at the preliminary trial were introduced as exhibits in the hearing of the petition for writ of error coram nobis. The homicide occurred on September 12, 1970, in the Maylene Community of Shelby County. Petitioner shot his wife with a 12 gauge pump gun in their trailer home around 8:30 P.M. She was shot three times. After the shooting, she walked to the home of her parents which was located several yards from the trailer. She was bleeding profusely from the shotgun pellets both in front and back of her body. Her father and mother met her at the door of their home and assisted her to the bathroom where her mother started washing blood from her. She died in the bathroom before the ambulance arrived.

Petitioner immediately left the scene of the shooting and was arrested later that night in Bessemer, Alabama, and returned to the Shelby County Jail. The investigating officers gave him the *Miranda* warnings and he signed a waiver of rights form and also signed a confession. The rights form and the signed confession were introduced at the preliminary hearing but were not offered as evidence on the main trial, and no reference thereto was made.

Upon filing a *pro se* petition, the trial court appointed counsel to represent the petition and set the case for a full evidentiary hearing several weeks later. The record reflects that appointed counsel was also retained by petitioner's family to represent him. Counsel filed another petition in which he adopted all of the allegations of the *pro se* petition but greatly expanded this petition with other allegations.

The main thrust of the petition as last amended is the contention that petitioner did not have the requisite intent to shoot his wife. He further contends that the only shotgun shells he had in his possession on the night of the homicide were No. 5 shot, and that the evidence was uncontradicted that No. 6 shot were removed from the lungs of the deceased.

Appellant presents this syllogism: My wife died from No. 6 shot; I only shoot No. 5's; therefore, someone else killed my wife and I should be released from custody. Appellant made every conceivable effort to retry the homicide case and resorted to the rankest kind of hearsay testimony to prove that the family of the deceased

**228**

played some part in her death and that he is serving time for a crime he did not commit. Finally, he urges that if it be proved that he is guilty in the shooting death of his wife, that his sentence is too long and should be reduced.

So strong was petitioner's insistence that only No. 6 shot were removed from the body of his wife, and that he only had No. 5 shot in his possession, the trial court, out of a sense of innate fairness acceded to petitioner's request to permit the toxicologist to take the front door to the trailer that contained shotgun pellets, the 12 gauge pump gun, the three spent shotgun shells, and the four unspent shells found in the trailer after the shooting, and conduct a firearm test and report his findings to the court. The trial court made it plain that he would abide by the findings made by the toxicologist. The toxicologist's report is as follows:

"C. J. rehling, Ph.D., Auburn State Toxicologist

Carlos L. Rabren, Auburn Assistant Director

(GREAT SEAL OF ALABAMA)

STATE OF ALABAMA DEPARTMENT OF TOXICOLOGY AND CRIMINAL INVESTIGATION
Auburn, Alabama
BIRMINGHAM DIVISION
507 Public Health Building
Birmingham, Alabama

November 27, 1973

Laboratory Directors
James C. Britton, III, Selma
John M. Case, Jacksonville
Nelson E. Grubbs, Mobile
Robert B. Johnson, Birmingham
A. Lamar Miller, Enterprise
E. Taylor Noogle, Jr., Auburn
Vann V. Pruitt, Jr., Huntsville
James L. Small, Montgomery

"Re: Case 1–102, 137
Mrs. Doris Franklin Creel, dec., vic.
Charles Eugene Creel, susp.

"MEMORANDUM: To File
BY: Robert B. Johnson, Toxicologist
SUBJECT: Examination of Evidence

"On 11/2/73, I received from Judge James Sharbutt, Columbiana, Alabama, through his secretary-court reporter, Mrs. Embry, the following items of evidence (submitted in a hearing wherein Charles Eugene Creel was defendant and the State of Alabama was Plaintiff (re. the death of Mrs. Doris Franklin Creel, our Case No. 75725): Exhibit #14.

"(1) Three 12 gauge spent shotgun hulls * (State's Exhibit #2)

(2) A 12 gauge Revelation shotgun, Model 300-Pump shotgun with four live 12 gauge cartridges attached to barrel with scotch tape (Petitioner's Exhibit #3)

(3) A trailer door—Exhibit #12, Petitioner's Exhibit #4.

"The four 12 gauge live cartridges described as Exhibit #3 above, were examined microscopically and each was found to bear traces of blood. The quantities present were too small to permit determination of human quality or for blood-grouping.

"The spent hulls (State's Exhibit #2, were compared microscopically with test hulls fired in the above described shotgun. Similar microscopic markings were found on each which identified all of the above described hulls as having been fired in the same gun. Test cartridges fired were:

(1) Remington-Peters shurshot #6 similar to 2 of the evidence hulls.
(2) Western Super–X, #4
(3) Peters HV #5.

"In each case the marks were similar, though some were more distinct than others, that is a better pring of the patter (sic) was obtained, through (sic) there were no differences in the marks obtained. The distinctive markings consisted of breech-face marks, which were the most characteristic, extractor marks, and firing pin marks. The firing-pin marks were the least distinctive, but consistent in each case. Photographs of the extractor marks and the breech-face marks were made.

"In firing the shotgun, it was noted that the first cartridge fell out each time, and had to be put back in the gun. The door was examined grossly, and the various shot removed from each hole and kept separately. It was found that the holes in the upper part of the door were made from inside out, that is, from the wooden side toward the metal side, and at an angle of about 45 degrees from the 'knob-side' toward the hinge side. The shots were in essentially a horizontal plane. With the permission of the Court, the wood facing of the door was cut and the outside panel removed to facilitate recovery of the pellets without damaging the holes. One shot went through the glass panel, and only a fragment of lead was recovered, not sufficient to determine its size. Of the holes in the food, *the upper one was determined to have #5 shot (2 pellets recovered)*. The lower hole was found to contain seven pellets determined to be #6 shot. (One large pellet was found to be two smaller pellets fused together by impact). (Emphasis supplied)

"All of the above exhibits were repackaged, and re-sealed where possible, for their return to Judge Sharbutt.

" * Three Remington-Peters 12 gauge hulls (green plastic; 2 Express #6, 1 Express #5. They were banded together with a rubber band and scotch tape; label attached '11:00 P.M., 9–12–70, Found in Living Room Floor of Charles E. Creel, JMD, 9–12–70', 'State's Exhibit #2'.

"Pellets from upper hole weighed 0.158 grams at 2.42 grains. Standard shot weights: Pellets from lower hole weighed 0.121 grams at 1.86 grains.

#3—4.01 grains
#4—3.21 grains
#5—2.54 grains
#6—1.96 grains
#7—1.46 grains

"Photographs are enclosed. /S/ ROBERT B. JOHNSON
RBJ/gp"

.. 

The above report put the quietus to petitioner's contentions, and he is back at servitude.

It is not the office of a writ of error coram nobis to retry indictments. Its mission is to "root out egregious fraud or collusion leading to a judgment." Horsley v. State, 42 Ala.App. 567, 172 So.2d 56; Willis v. State, 42 Ala.App. 85, 152 So.2d 883; Duncan v. State, 42 Ala.App. 111, 154 So.2d 302.

The writ of error coram nobis is not intended to provide a review by appeal where the complaining party has not sought to appeal and the time for appeal has long since expired. Thomas v. State, 280 Ala. 109, 190 So.2d 542.

The judgment of the trial court is affirmed.

Affirmed.

ALMON and TYSON, JJ., concur.

CATES, P. J., and DeCARLO, J., not sitting.